659 A.2d 999

**COMMONWEALTH of Pennsylvania,**

**v.**

**Robert E. LASSEN, Appellant.**

Superior Court of Pennsylvania.

Submitted March 13, 1995.

Filed May 16, 1995.

300

302

304

Robert E. Lassen, appellant, pro se.

Robert A. Sambroak, Jr., Asst. Dist. Atty., Erie, for Com., appellee.

Before KELLY, JOHNSON, and HESTER, JJ.

HESTER, Judge:

*Pro se* appellant, Robert E. Lassen, appeals the September 30, 1994 order denying him relief under the provisions of the

PCRA. Appellant contends that his trial counsel was ineffective in numerous respects. We affirm.

Appellant was charged in two separate criminal actions. The first action involves an incident that occurred late in the night of October 24, 1991, and early in the morning of October 25, 1991. Appellant assaulted Jerilee Everson, held a steak knife to her neck, threatened to kill her and their son, and tied her up with an extension cord. After charges were brought for this incident, appellant sent two letters to Ms. Everson, in which he tried to convince her not to testify against him, offered her financial support if she did not testify, and threatened her with loss of custody of the child if she did. These letters resulted in a second set of criminal charges involving intimidation of a witness.

At the consolidated trial on all charges, Ms. Everson testified as follows. Appellant became her boyfriend in November, 1989, and he is the father of their son, Corey, who was twenty months old. On October 24, 1991, between 2:00 and 3:00 p.m., appellant came to her home. Appellant wanted her and the baby to come with him to a bar, but she refused. Appellant left and returned between 4:30 and 5:00 p.m. that day. The two argued, and appellant left again with a friend. Ms. Everson also left the home with a friend, drank at a local bar, returned around 10:30 p.m., and put Corey to bed.

Appellant returned at 11:00 p.m. and told Ms. Everson that he had made some long distance telephone calls on her phone. She became angry, unplugged the telephone, took it to her bedroom, and then returned to the kitchen. Appellant followed her into the kitchen, and as he came around a corner, he struck her in the face with his closed fist. Ms. Everson was unconscious temporarily. When she regained consciousness, she was in her bedroom, and appellant was tying a heavy-duty extension cord around her hands. Her feet already were bound with the cord, and appellant finished by tying her hands and feet together behind her back. Appellant then stated that "he had to do [her] in." Notes of Testimony, 3/19/92, at 33.

Appellant left the room temporarily and when he returned, he pulled the victim's head back by the hair and asked her, "Do [you] want to die now or do [you] want to die later?" *Id.* at 35. Appellant then placed a steak knife to her throat and "scratched it." *Id.* Next, he picked her up by the back of the neck and told her that "if he couldn't have [her], nobody could." *Id.* at 36. He placed her on the bed, turned off the light, and left the room.

Corey began to cry. Ms. Everson asked appellant to take care of him. Appellant said that he "would [do] even better than that." *Id.* He brought the child into the bedroom, threw him on the bed, and said, "You better love him and kiss him while you can because it's the last time you are going to see him." *Id.* at 37. He then accused Ms. Everson of being an unfit mother.

The victim pleaded with appellant to return Corey to his bed, and appellant eventually complied. While appellant was gone, Ms. Everson managed to "waddle" into the kitchen, knock the telephone off the hook, and telephone the police, using the knife and a hand which she had managed to free from the cord. *Id.* at 38.

Appellant discovered the victim, and she showed him that she had the knives and told him that she was not going to hurt him. Appellant untied her and placed her in the living room. Police arrived and arrested appellant.

After appellant was arrested, Ms. Everson received two letters, one postmarked November 13, 1991, and the other postmarked November 15, 1991. Both were received just prior to the preliminary hearing. While the letters were admitted into evidence, appellant has not included them in the record. Ms. Everson, however, did read portions of them at trial. It was stipulated that appellant wrote the letters, in which he stated to Ms. Everson:

"Of course, you know how both of us can avoid this ugly mess, don't you? There is no law that says you have to show up for my [preliminary] hearing next Monday the 18th. If you are not there, my lawyer is going to ask

[Frank] Abate[, the district justice,] to drop all the charges against me for lack of evidence. You are the evidence, Jeri. Without you there they have no case, no victim, no crime. I'm asking you outright in this letter not to be there next Monday the 18th."

. . . .

"Only more harm will come of this if you don't drop the whole matter. At this point there is no need for either of us to suffer anymore over this. There is more for you to gain by my freedom than by being locked up, at least you'll get your child support and maybe some day Corey will be a part of his father's life. You can't see anything bad about that. I'll end this here. If I wind up getting out after Monday, I'll need to call you so expect it. If not, I'll see you in court. Please do the right thing, Jeri. . . .

. . . .

"One of the things that really bothers me about all this is that if you go through with this, Corey is going to suffer right along with us. It's bad enough that he may never know his father, but if this winds up going to trial because of your hate for me, I'm not bluffing when I said I'll tell the whole truth. That whole truth would wind up causing both you and Corey a great deal of hardship. You'll lose your HUD to start with, welfare will file charges against you and Children's Services is going to investigate you thoroughly. You could wind up in jail yourself in the end, and don't think there is no possibility that Corey wouldn't be taken from you." . . .

. . . .

"That possibility does exist once this can—once this can of worms is opened, there is no putting a lid back on it. As bad as I don't want to go to prison, I also don't want to hurt you and Corey any further. You are going to force me into a situation where I'm not going to have any choice but to lay all the facts out on the District Attorney. He's not going to have any choice but to file fraud charges against you. And have you forgotten that you are still on parole yourself? Things could get very ugly for you if I have to take the stand in my defense and my lawyer wants to say everything

he can to discredit you while you are on the stand. That's his job, Jeri. And the minute you lie about anything in your testimony, they're going to come down real hard on you. You'll wind up hanging yourself probably."

. . . .

. . . "Drop the whole thing before it's too late and goes to far. Take the easy way out, Jeri, let me get on with my life. You get on with yours, put it all behind you, as I will. You win, okay. Love you still, Rob. If you save my checks and food stamps, I'll share some of it with you if I do get out. We will call it a gift."

*Id.* at 44–47.

The November 15, 1991 letter read in part:

. . . . "I know that anything I could say or do right now would be to—now would be too little, too late. I'm also sure that anything you do or say wouldn't change anything either. Everything has gone past the point of taking anything back. I can only hope that you have enough compassion left in you for me to not want to see the rest of my life ruined. It would be pointless to make things worse than they already are. I hope you can see that there has already been enough damage. So please, Jeri, don't testify against me in court. We both know I'm not coming back, isn't that enough? If I can avoid prison, I can start over here in Erie. There is no reason why Corey can't see his daddy once in awhile. You can't tell me that by—you can't tell my that boy doesn't love and miss his daddy right now. All boys need their father, even if it's only part-time. I don't want him growing up feeling insecure, thinking his father didn't love him. I guess I'll end this here. I've already said all I can for now. I won't be writing anymore. If I do get out, I'll let you know. If I don't, you'll know why. You'll know why anyway. I love you, Jeri, and I guess I always will. I hope Corey is doing okay. Please stay home Monday, Jeri. Love you both, Rob."

*Id.* at 48–49.

The trial evidence continued with the testimony of North East Borough Police Officers James Jobczynski and James

Yanosko, who responded to Ms. Everson's call at approximately 1:30 a.m. on October 25, 1991. Officer Jobczynski testified that Ms. Everson answered the door and that her eye was swollen and there was dry blood on her nose and shirt. She was "crying, she was visibly shaken, [and] she seemed somewhat relieved" when they arrived. *Id.* at 94. Officer Jobczynski found the orange extension cord in the bedroom but no knife was taken since there were several in the kitchen, and the victim could not identify which one appellant had used.

Officer Yanosko testified that when he first arrived at the scene of the crime, his partner went to interview the victim and he stayed with appellant who appeared relaxed and acted as if there had been no disturbance. The officer asked appellant if there had been a problem and what had occurred. Officer Yanosko testified that "[appellant] said, 'Nothing.'" *Id.* at 105. After Officer Jobczynski took Ms. Everson's statement, Officer Yanosko placed appellant under arrest, read him his *Miranda* warnings, and again asked him what had transpired. The officer testified that appellant again responded, "'Nothing.'" N.T. 3/19/92, at 107. The officer then asked how the victim had become injured. Appellant informed the officer that Ms. Everson "come home drunk and fell on the stairs." *Id.* at 107.

The jury were given as exhibits pictures of the victim's injuries [1] as well as the two letters which appellant wrote to Ms. Everson after he was charged in connection with the October 24–25, 1991 incident.

In his defense, appellant testified as follows. He provided significant financial support to Ms. Everson from the time they became intimate and was a caring and attentive father to Corey. He described Ms. Everson as an unfit mother who frequently took Corey to bars, as an alcoholic, and as dependent upon Librium. He stated that she suffered black-outs from her alcoholism and suggested that she was too intoxicated on the night in question to remember events accurately.

---

1. These exhibits are not in the record. However, the victim stated that she had a black eye, the eye was swollen shut, and her nose had been cut by her glasses.

Appellant stated that on that night, the two were arguing over her unfitness to care for Corey and she started the physical altercation:

And so basically ... she had gone into the bedroom. She had enough of this arguing with me, and I followed her in there and we started arguing in the bedroom. And I just told her right then, I said, "That's it." I said, "I'm done with this relationship." I says, "You are ruining my life. You are going to ruin Corey's life. You know something drastic is going to happen with you and this baby, and you're just an unfit mother." And that's when she cold-cocked me with her open hand right in the ear, and it just made my whole head ring and burned my ear. Now, she had struck me many times in the past, and I know how to defend myself; so when she hit, I grabbed her wrists and the only way to prevent her from hitting me is stop her from hitting me. So if I hold her hands, she can't hit me, she can only kick at me, and the best way to keep her from struggling with me is to get her off her feet. So I pushed her down on the bed and she went down on the bed. And I'm standing in front of her holding her wrists, she is cussing at me and trying to swing at me and I'm holding her wrists as best I could.

N.T., 3/20/92, at 33. To explain the presence of the extension cord in the bedroom, appellant said that it was on the floor during their struggle and that the victim became entangled in it while assaulting him. He also described how the victim sustained a swollen eye and bloody nose, as follows:

[S]o what happened was, her feet went between my legs and she kicked me in the butt. And when she kicked me in the butt with such force, she basically lifted me kind of off my feet and threw me forward onto her and on to the bed and my arms landed right across her face, her nose hit about here and my elbow hit right under her eye, I believe.

. . . .

Well, when I landed on her, I immediately rolled off to my left, which would be her right, onto my back and I sat up very fast and looked over, and by this time blood was

coming out of her nose. I said, "Oh, my God. Oh, man, look at your face. I'm sorry." I reached down, there was a pair of pants that I had laying on the ground and I handed it to her and, "You better stop the bleeding." Because now it was bleeding pretty good and dripping.

*Id.* at 37–38. Appellant insisted that he did not tie up the victim in the cord and also denied holding a knife to her throat and threatening her and Corey.

In rebuttal, Sherry Steinger, who had been with Ms. Everson the evening of October 24, 1991, testified that Ms. Everson was not intoxicated and that when Ms. Steinger saw appellant during the course of that evening, he had been. Douglas Wheaton also saw the two witnesses that evening and testified consistently.

Based on this evidence, appellant was convicted of one count each of simple assault, unlawful restraint, reckless endangerment, terroristic threats, and of two counts of intimidation of a witness. On April 10, 1992, appellant was sentenced to serve an aggregate term of imprisonment of nine to twenty years. No direct appeal was filed. Appellant was granted permission to appeal *nunc pro tunc,* and we affirmed. *Commonwealth v. Lassen,* 433 Pa.Super. 652, 639 A.2d 839 (1993).

On August 19, 1994, appellant filed a *pro se* petition for post-conviction relief, and counsel was appointed. On September 28, 1994, the attorney submitted a no-merit letter and petition to withdraw to the PCRA court. On September 30, 1994, the PCRA court granted counsel's petition to withdraw and denied PCRA relief. This *pro se* appeal followed.

Appellant's claims are as follows. 1) He received ineffective assistance from his preliminary hearing counsel in that counsel did not prepare adequately for the preliminary hearing and failed to seek recusal of the district justice, who was biased against appellant because appellant had worked for him and had been convicted of robbery in connection with that employment. 2) Preliminary hearing counsel was ineffective for failing to transcribe the preliminary hearing testimony for impeachment purposes since there were various inconsisten-

cies among the victim's testimony at that hearing, the statements which she gave to police at the time of the incident, her testimony at a hearing for a protection from abuse order, and her testimony at trial. 3) Pretrial counsel was ineffective for failing to negotiate a guilty plea to "reduced charges." Appellant's brief at 6. 4) Trial counsel was ineffective for failing to present medical evidence that appellant had a broken right hand, which was the hand the victim testified he used to strike her, and for failing to present the testimony of North East Police Officer Chuck Rosequist, who would have testified as to the victim's violent propensities when intoxicated. 5) Trial counsel was not adequately prepared for trial in that his only defense strategy was to present appellant's testimony. 6) Trial counsel was ineffective for failing to seek preclusion of photographs taken of the victim the night of the October 24, 1991 incident based on the fact that they were inflammatory and prejudicial. 7) Trial counsel was ineffective for failing to ensure that a court reporter was present so that the jury voir dire could be transcribed. 8) Trial counsel was ineffective for giving appellant unethical advice to try and settle this criminal matter with the complainant based on counsel's conclusion that the matter simply was a domestic dispute. 9) Trial counsel was ineffective for not requesting a mistrial after the victim, when asked on cross-examination about the intimacy of her relationship with appellant, stated non-responsively, "He was in jail more than he was out." N.T., 3/19/92, at 58. 10) Trial counsel was ineffective in failing to present witnesses to demonstrate that the victim committed perjury when she stated that appellant never lived with her. 11) Improper reference to appellant's post-arrest silence was made by the prosecutor at trial and by his arresting officer since the police officer who arrested him obviously did not recall accurately the events of the arrest and must have been mistaken when he testified that appellant informed him that the victim received her injuries on the night in question by falling down the stairs. 12) The prosecutor engaged in improper closing argument. 13) Trial counsel rendered ineffective assistance in acquiescing in the trial court's refusal to allow appellant to read to the jury the two letters which he wrote to the victim and which were

sent out with the jury at trial. 14) Even if each error, viewed in isolation, does not require grant of a new trial, the cumulative effect of those errors do. 15) Direct appeal counsel was ineffective for failing to pursue these issues. 16) PCRA counsel was ineffective for failing to pursue these issues.

Initially, we discuss whether appellant's claims for relief may be entertained under the PCRA. Appellant's eligibility for relief is governed by the provisions of the Post–Conviction Relief Act. 42 Pa.C.S. § 9543 controls appellant's eligibility for relief under the PCRA and lists four factors that must be met before such relief may be granted. 42 Pa.C.S. §§ 9543(a)(1), (a)(2), (a)(3), and (a)(4).

In the present case, appellant was incarcerated for these charges at the time his PCRA petition was filed. These precise issues were not raised on direct appeal and were not litigated previously. 42 Pa.C.S. § 9544. In addition, since this is appellant's first petition for post-conviction relief, his allegations that previous counsel were ineffective for not raising the claims is sufficient to overcome the bar of waiver. *Commonwealth v. Christy*, 540 Pa. 192, 656 A.2d 877 (1995); *Commonwealth v. Eaddy*, 419 Pa.Super. 48, 614 A.2d 1203 (1992); *Commonwealth v. Pitts*, 397 Pa.Super. 387, 580 A.2d 352 (1990); *Commonwealth v. Weinder*, 395 Pa.Super. 608, 613 n. 2, 577 A.2d 1364, 1367 n. 2 (1990); *Commonwealth v. Velasquez*, 387 Pa.Super. 238, 563 A.2d 1273 (1989).

We now must determine whether appellant's claims are cognizable under the PCRA. In most instances, appellant alleges that prior counsel was ineffective for failing to take specified action. Section 9543(a)(2) limits the types of claims that are cognizable and provides that if the allegation relates to the stewardship of counsel, a petitioner must plead and prove that his conviction resulted from "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place."

Thus, when a claim for PCRA relief relates to stewardship of trial counsel, counsel's actions must implicate the

truth-determining process in order to be facially cognizable. *See Commonwealth v. Moody*, 439 Pa.Super. 563, 654 A.2d 1120 (1995). Claims relating to trial counsel's stewardship at a preliminary hearing are not cognizable since the truth-determining process is not implicated. *Commonwealth v. Lyons*, 390 Pa.Super. 464, 568 A.2d 1266 (1989) (allegations relating to defective preliminary hearing are not cognizable under PCRA); *see also Commonwealth v. Tanner*, 410 Pa.Super. 398, 600 A.2d 201 (1991) (allegation of ineffective assistance of counsel in failing to file motion to dismiss for violation of Rule 1100 is not cognizable under the PCRA); *Commonwealth v. Wolfe*, 398 Pa.Super. 94, 580 A.2d 857 (1990) (PCRA petitioner's challenges to prior counsel's stewardship were not cognizable as they related to counsel's actions in connection with sentencing issues, which do not implicate the truth-determining process); *Commonwealth v. Pitts*, 397 Pa.Super. 387, 580 A.2d 352 (1990) (allegation that trial counsel was ineffective for failing to seek severance was not cognizable under the PCRA as it did not implicate the truth-determining process); *Commonwealth v. Grier*, 410 Pa.Super. 284, 599 A.2d 993 (1991) (fact that counsel did not introduce evidence at revocation hearing that may have impacted on sentence is not cognizable under the PCRA). Appellant's claims that counsel was ineffective in connection with the preliminary hearing, in failing to seek a guilty plea, and for giving unethical advice to settle the matter with the victim have no impact on the truth-determining process in this case. Therefore, they are not cognizable.

Several of appellant's claims fail due to a lack of specificity. These include his argument that the preliminary hearing testimony should have been transcribed. He fails to indicate in what respect the testimony at that hearing conflicted with the victim's testimony. Similarly, appellant's allegation of lack of preparation is unsupported by reference to any viable defense available to him. Indeed, appellant admits that trial counsel used an investigator, contacted the witnesses who appellant had identified, and informed appellant that the witnesses were not willing to testify on appellant's behalf. Ap-

pellant's brief at 13. Finally, the issue of whether the voir dire should have been transcribed is not supported by reference to specifics as to how the reliability of the truth-determining process was impugned by the jury which sat. There is no indication at all that any juror was prejudiced against appellant.

■ Abstract allegations of ineffective assistance of counsel unsubstantiated by reference to specifics are not considered on appeal. *Commonwealth v. Silo*, 509 Pa. 406, 502 A.2d 173 (1985) (abstract allegations of ineffectiveness will not be considered); *Commonwealth v. Shaw*, 494 Pa. 364, 370 n. 3, 431 A.2d 897, 900 n. 3 (1981) (failure to elaborate on mere assertion in brief that admission of confession violated fifth amendment results in waiver); *Commonwealth v. Pettus*, 492 Pa. 558, 424 A.2d 1332 (1981) (boilerplate allegations of ineffectiveness will not be considered); *Commonwealth v. Badman*, 398 Pa.Super. 315, 322–23 n. 2 and n. 3, 580 A.2d 1367, 1370 n. 2 and n. 3 (1990) (issue waived if argument is mere assertion); *Commonwealth v. Blackwell*, 312 Pa.Super. 117, 458 A.2d 541 (1983) (appellant's failure to name witness and substance of testimony waived claim that counsel was ineffective for failing to present witness); *see also Commonwealth v. Chew*, 338 Pa.Super. 472, 479 n. 3, 487 A.2d 1379, 1383 n. 3 (1985); *Commonwealth v. Ignatavich*, 333 Pa.Super 617, 623, 482 A.2d 1044, 1047 (1984).

■ Appellant's assertion that the photographs were inadmissible based on the fact that they were inflammatory and prejudicial is waived due to his failure to include the photographs in the record. "[F]or the purposes of appeal, it is the responsibility of the appellant to offer a complete record for our review." *Commonwealth v. Muntz*, 428 Pa.Super. 99, 107, 630 A.2d 51, 55 (1993), quoting *Commonwealth v. Feflie*, 398 Pa.Super. 622, 630, 581 A.2d 636, 640 (1990), *see also Commonwealth v. Gonzalez*, 415 Pa.Super. 65, 608 A.2d 528 (1992). "Where a claim is dependent upon materials not provided in the certified record, that claim is considered waived." *Commonwealth v. Muntz, supra*, 428 Pa.Super. 99, 630 A.2d 51.

Appellant's failure to ensure that these photographs were in the record is fatal to this claim.

Appellant's remaining ineffectiveness claims are subject to the following standard of review:

> In order to make out a claim [of ineffective assistance of counsel] on a PCRA appeal, petitioner must show that "the underlying claim is of arguable merit; that counsel's action or inaction was not grounded on any reasonable basis designed to effectuate his interest; and that the commission or omission so undermined the trial that the verdict is unreliable." *Commonwealth v. Szuchon*, 534 Pa. 483, 633 A.2d 1098, 1099 (1993).

*Commonwealth v. Moody, supra*, 439 Pa.Super. at 566–67, 654 A.2d at 1121.

 Three of appellant's claims fail since they had no impact on the outcome of his trial. First, he suggests that trial counsel was ineffective for failing to present medical evidence that he had a broken right hand on October 24, 1991. No one contested this, and the jury was aware of it. The victim stated that appellant had a broken hand and he was wearing a cast at the time of the incident. N.T., 3/19/92, at 53. Appellant also informed the jury that he had broken his hand and that it was in a cast at the time. N.T., 3/20/92, at 13–15. Medical evidence on the issue would have been cumulative.

 The next claim involves the victim's reference to appellant's time in jail. During cross-examination as to whether appellant was living with her and providing support to her, the victim insisted that appellant was not living with her because he was in jail more than he was out of jail. Appellant argues that counsel should have requested a mistrial. Meanwhile, the jury became aware of appellant's record and the amount of time he was in jail through appellant's own direct testimony. N.T., 3/20/92, at 4–8. The district attorney did not exploit the remark and did not elicit the evidence. There was no grounds for a mistrial.

■ The third issue concerns the letters appellant wrote to Ms. Everson. He argues that he should have been able to read them to the jury in their entirety. However, appellant suffered no prejudice from the trial court's refusal to allow him to read the letters to the jury. The letters were sent out with the jury during deliberations, and appellant explained his innocent intentions in sending them.

Thus, the outcome at trial could not have been affected by these three *alleged* errors. *Commonwealth v. March*, 528 Pa. 412, 598 A.2d 961 (1991) (allegations of ineffectiveness are not self-sustaining based on issue of arguable merit, and the defendant must substantiate that he was prejudiced by the failure of counsel to take the particular action); *Commonwealth v. Miguel*, 409 Pa.Super. 429, 598 A.2d 71 (1991) (prejudice is established only if there is a reasonable probability that the result at trial would have been different).

■ Appellant also contends that at trial, improper references were made to his post-arrest silence. As this allegation involves a claim that his fifth amendment right against self-incrimination was violated, it is cognizable under section 9543(a)(2)(v). *See Commonwealth v. McCord*, 435 Pa.Super. 1, 644 A.2d 1206 (1994) (claim that a sixth amendment constitutional right to speedy trial was violated is cognizable under section 9543(a)(2)(v)).

■ This contention has two aspects. Appellant first alleges that North East Borough Police Officer James Yanosko referred to his post-arrest silence by implication. Specifically, he contends that he did not say anything to police when they arrived at his home, that Officer Yanosko admitted that his memory about the events was hazy in certain respects, that the officer therefore was incorrect about the statements that appellant made at the time of his arrest, and that accordingly, the officer implicitly told the jury that appellant remained silent.

This is not so. Officer Yanosko testified that when he first arrived at the scene, appellant told him nothing had happened. After viewing the victim's bloody nose and swollen eyes and

after his partner took her statement, Officer Yanosko placed appellant under arrest, read him his *Miranda* warnings, and again asked him what had transpired. The officer testified that appellant again responded, " 'Nothing.' " N.T. 3/19/92, at 107. The officer then asked how the victim was injured. Appellant informed the officer that Ms. Everson fell down the stairs. The officer never stated that appellant invoked his right to remain silent; thus, this claim fails.

■ Appellant also suggests that reference was made to his post-arrest silence by the prosecutor. Again, appellant confuses the fact that he was the one who testified that he was silent at the time of his arrest and that the prosecution maintained that he had made statements indicative of guilt, in light of the nature and extent of the victim's injuries, both to police and in the letters which he wrote to the victim following the incident. In support of this claim, appellant cites to the portions of the record where he was being cross-examined by the prosecutor:

Q. Okay. And when the police came to your house, or to Jeri's house that early morning on the 25th, you never told them about how she got those injuries to her face?

A. I had a right to remain silent, and I didn't know what she had said. I had no idea she had told them that I had hit her until—

Q. Okay.

A. —until the following day.

Q. Well, at some point in time, shortly after that morning, you found out what Jeri was saying you did to her, right?

A. I found out the next morning when I was taken in front of Frank Abate.

Q. Okay.

A. That's when I found out that she had alleged that I hit her.

Q. Okay. Have you ever told anyone before you came in this courtroom this morning the version that you told us this morning about how these injuries occurred, have you ever told anyone that before?

A. I've told my lawyer.

Q. Okay. Other than your lawyer, have you told anyone else that?

A. Not really.

Q. Okay. You saw Officer Yanosko at the preliminary hearing, didn't you?

A. Correct.

Q. And you didn't tell him at the preliminary hearing, wait a minute, this is all backwards, she hit me and I just happened to fall on her and bruised her face; you didn't tell him that?

MR. TRAMBLEY [Defense Counsel]: I object to this question. Even at the preliminary hearing the defendant still has a right to remain silent.

THE DEFENDANT: Right.

THE COURT: The objection is sustained.

*BY MS. EARLL* [District Attorney]:

Q. On the morning that the police came over to your house, you did tell them Jeri fell down the stairs?

A. No, I said to Jim, "I don't know, for all you know she fell down the stairs," in a joking manner.

Q. Okay. Why did you tell him that and why didn't you say listen, she got those injuries because I fell on her face?

A. Because I had a right to remain silent.

Q. But you didn't, you told him she fell down the stairs?

A. No, I said, "For all you know, she fell on the stairs."

Q. Okay. You heard Officer Yanosko testify yesterday, correct?

A. Correct.

Q. And you heard Officer Yanosko testify that as he recalled, you told him she was drunk and she fell down the stairs. Are you telling me that you didn't tell Officer Yanosko that?

A. Officer Yanosko testified yesterday he couldn't remember a lot of what I said that night.

Q. Okay. But he did remember you saying that particular statement, did you hear him say that?

A. He said yesterday he remembered I said something like that.

Q. Okay. Like she was drunk, she fell down the stairs?

A. He said I said, "For all you know, she fell on the stairs."

Q. Okay. Now, in this first letter that you wrote Jeri, it's a pretty lengthy letter, two pages, both sides, single lined and fifth page single lined almost the full page, and basically you are asking Jeri not to show up at the preliminary hearing, right?

A. I was asking her to do the right thing.

Q. Okay. But nowhere in this letter do you say to her, "Jeri, do the right thing. Please tell the truth. Tell them that I accidentally injured you." You do not say that anywhere in this letter, do you?

A. No, because Jeri was so drunk that night and she suffers from so many blackouts, I don't know what she really believes did happen that night.

Q. Oh, so when she came in here and testified and told us that you hogtied her with this cord behind her back, she is just kind of hallucinating that that happened?

A. In her mind she may have saw it that way.

N.T., 3/20/92, at 58–61. While certain portions of this cross-examination, viewed in isolation, appear to be an attempt to establish guilt by silence, in the context of this case, it was not.

Appellant made a number of prior statements about the incident, including to the police and in letters which he sent to the victim attempting to get her to not testify. At trial, he testified extensively, contending that the victim was too intoxicated to remember how she sustained her injuries and the victim was assaulting him when he accidently injured her. This testimony was inconsistent with the thrust of his letters and with his explanation of how the victim was injured when he was questioned by police on October 25, 1991. In light of the fact the outcome at trial depended on the credibility of the

only two witnesses to what occurred on October 25, 1991, the district attorney engaged in impeachment through appellant's prior inconsistent statements.

Therefore, when the prosecutor asked the first question, which was whether appellant made a statement to police when first questioned, in the context of this case, it was an attempt to establish that he *had*—that he had told police that the victim fell down the stairs—not that he had not. This becomes clear later during cross-examination since after this initial question, the prosecutor consistently attempted to establish that appellant told the police that the victim fell down the stairs.

A reading of the entire trial record indicates that the district attorney's position was that if appellant's trial testimony that he accidentally struck the victim were true, it conflicted with his prior statement to police that the victim suffered the injuries when she fell down the stairs and that it also was inconsistent with statements that he made in the letters. In other words, the prosecutor was asking appellant if his trial testimony were true, why he did not indicate that the victim suffered the injuries in the *same manner* in his letters to the victim and in his prior statements to police. The prosecutor was not suggesting that if appellant were innocent, he would not have remained silent and would have come forward with his story prior to trial. *Compare Commonwealth v. Clark*, 533 Pa. 579, 626 A.2d 154 (1993).

Appellant had made prior statements which became very incriminating when he gave his extensive trial testimony about how the victim sustained her injuries. We can perceive no rule of law which indicates that a prosecutor may not demonstrate that a defendant's trial testimony is *different* from other statements he gave and if that trial testimony were true, the prior statements would have been consistent with this testimony. Cross-examination with prior inconsistent statements is an established impeachment method. This is precisely what this district attorney was doing in this cross-examination, and it is apparent from reading the entire trial transcript that she was not attempting to establish that if appellant's trial testi-

mony were true, he would have come forward to police with his innocent version earlier.

There is one point where the prosecutor did start to tread in dangerous waters—with the two questions about why appellant did not offer this version at the preliminary hearing. However, at that point, counsel objected and brought to the jury's attention that appellant had a fifth amendment right to remain silent. Counsel did not request a mistrial.

As noted above, to be entitled to a new trial under the PCRA, a defendant must establish that counsel's actions prejudiced him to such an extent that a *reliable* determination of guilt was not made at trial. We conclude that these two questions did not affect the reliability of the outcome at trial when viewed in the context of the cross-examination as a whole, in light of the letters that appellant sent to the victim, and given the fact trial counsel did point out to the jury that appellant's silence at the preliminary hearing could not be indicative of guilt since he did have the right to remain silent. Thus, these two questions do not entitle appellant to a new trial.

Appellant also argues that trial counsel erred in not seeking a mistrial based on the prosecutor's improper closing remarks. A prejudicial, improper closing could undermine the truth-determining process; this claim therefore is cognizable. Our standard for reviewing whether closing comments by the prosecution require a grant of new trial is well-established:

The Pennsylvania Supreme Court has consistently held that "not every intemperate or uncalled for remark by the prosecutor requires a new trial." *Commonwealth v. Green,* 525 Pa. 424, 460, 581 A.2d 544, 561 (1990). A new trial is required only in those instances where the language of the prosecutor is such that its "unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict." *Commonwealth v. Johnson,* 516 Pa. 527, 533, 533 A.2d 994, 997 (1987). The prejudicial effect of the prosecutor's remarks must be evalu-

ated in the context in which they occurred. *Commonwealth v. Green, supra,* 525 Pa. 424, 581 A.2d 544.

> A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statement or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.

*Id.* 525 Pa. at 460, 581 A.2d at 561–62. . . .

*Commonwealth v. Novasak,* 414 Pa.Super. 21, 606 A.2d 477, 480 (1992).

 We have reviewed the district attorney's closing statement. She argued that the victim was credible and noted that the victim's actions following the incident were consistent with credibility. This included the fact that after the incident, the victim filed a protection from abuse proceeding and started to live at a shelter for abused women. She invited the jury to observe the injuries shown on the photographs and consider that they were not consistent with the accident which appellant described. The district attorney noted that appellant's trial testimony was inconsistent with his letters and statements to police. She discussed the elements of the various crimes and if the evidence established those elements. Nothing in the closing meets the test discussed above.

 Next, we review appellant's claims that trial counsel was ineffective for failing to call a number of witnesses at trial. The allegations raise the possibility of a viable defense not being presented; therefore, they implicate the reliability of the truth-determining process and are cognizable. In this connection, we observe that our Supreme Court in *Commonwealth v. Stanley,* 534 Pa. 297, 632 A.2d 871, 872 (1993), stated:

> The Superior Court in *Commonwealth v. Petras,* 368 Pa.Super. 372, 534 A.2d 483 (1987), has properly assessed the elements determinative of a claim of ineffectiveness for failure to interview and/or present a witness. The existence and availability of the witness must be shown, as well as counsel's actual awareness of, or duty to know of the

witness; the witness' willingness and ability to cooperate and appear on the defendant's behalf; and the necessity for the proposed testimony in order to avoid prejudice. *Id.* at 377, 534 A.2d at 485.

Appellant first alleges that counsel was ineffective for failing to secure the testimony of four neighbors who would have established that the victim became violent when she was intoxicated and therefore who would have supported his version of how he inflicted the injuries on Ms. Everson. He admits in his brief that three of those witnesses were contacted by an investigator and that they indicated that they would not cooperate with his defense. He suggests that if the witnesses would have been contacted early in the proceedings rather than close to trial as they were, they would have testified for him. In the absence of affidavits from the witnesses indicating the truth of his assertion that if they would have been contacted earlier, they would have testified for him, we will not grant a new trial since appellant has not established the "witness' willingness and ability to cooperate." *See Commonwealth v. Jones,* 438 Pa.Super. 306, 652 A.2d 386 (1995) (mere allegation that a witness would have testified as a character witness is not sufficient to require grant of new trial; some evidentiary support for such an allegation must be present for relief to be granted); *Commonwealth v. Davis,* 381 Pa.Super. 483, 554 A.2d 104 (1989) (where no affidavits were filed from putative witnesses, defendant failed to establish they were available, willing to testify, and could have provided material evidence). For the same reason, we reject appellant's related argument that trial counsel was ineffective for failing to call character witnesses, which appellant neglects to name and which, in light of appellant's criminal record, are unlikely to actually exist.

Appellant also indicates that Mr. Wheaton, the prosecution witness, would have testified that Ms. Everson was violent. If this is true, appellant should have asked his attorney to ask Mr. Wheaton about the victim's violent tendencies when Mr. Wheaton testified for the prosecution.

■■ Appellant also contends that a number of witnesses, including his parole officer, should have been called by trial counsel to establish that the victim perjured herself when she testified that appellant did not live with her. As noted above, in a PCRA context, a new trial is awarded due to ineffective assistance of counsel only if the *reliability* of the truth-determining process is impugned. The squabble between appellant and his girlfriend about whether he actually resided with her was collateral to the issues at trial. Evidence as to this trivial matter, especially when the girlfriend maintained that appellant normally was jailed rather than residing with her, was not material enough to the issues presented to affect the reliability of this trial. In *Commonwealth v. Pitts*, 397 Pa.Super. 387, 580 A.2d 352 (1990), we held specifically that where the trial transcript establishes that the reliability of the trial process is not implicated by a PCRA petitioner's allegation, such allegation will not be grounds for relief. In that case, the PCRA petitioner alleged that counsel was ineffective for failing to assert self-defense to the murder charges of which he was convicted. We determined that based on the trial evidence, such a defense would have been false, and therefore, the PCRA petitioner was not entitled to relief since the failure to present that defense did not implicate the *reliability* of the jury's guilty verdict. *See also Commonwealth v. Perdue*, 387 Pa.Super. 473, 564 A.2d 489 (1989) (improper cross-examination did not undermine truth-determining process); *Commonwealth v. Blackwell*, 384 Pa.Super. 251, 558 A.2d 107 (1989) (while some pretrial identification procedures may undermine truth-determining process, procedure at issue did not).

Furthermore, our review of the record indicates that Ms. Everson did testify that appellant lived with her intermittently and there was no need to delve into this matter further. On cross-examination, the victim stated that appellant began to live with her in June, 1990, but that they did not live together in 1991. N.T., 3/19/92, at 55. However, she was effectively cross-examined further on this issue and admitted that appellant did stay overnight at her home occasionally until October,

1991. Since appellant's own testimony established the truth of her assertion that he was in "jail more than he was out," the opinion of the witness that he was not living with her seems solid. Further, Ms. Everson did state, however, that when he was not in jail, she and appellant had an intimate relationship which included him staying at her residence overnight. Our review of the record indicates that the jury was aware of the differing opinions between the victim and appellant as to whether he actually lived with her after 1990 and that they were aware that the two enjoyed an intimate relationship at the time of the incident. No reversible error occurred.

In the present case, our review of the record indicates that the victim described the events, photographs were admitted to support her testimony about her injuries, and appellant proffered a different reason for the victim's injuries. He denied making inconsistent statements to police, but police testified that he did. He wrote letters to the victim asking her not to testify and offering her continued financial support but never asking her to drop the charges because he accidently inflicted her injuries. The victim and appellant were the only witnesses. Appellant admitted that he was present when the victim suffered the injuries shown in the photographs. The district attorney argued that the above evidence and inferences from the evidence made the victim the credible witness. The jury resolved these conflicts in the evidence against appellant.

Furthermore, the photographs which supported the victim's testimony were not inadmissible merely due to the fact that they allegedly were inflammatory. *See Commonwealth v. Wharton*, 530 Pa. 127, 607 A.2d 710 (1992) (photographs of victim following criminal incident are relevant in establishing *mens rea* ). There is no caselaw which requires grant of a new trial due to counsel's failure to negotiate a guilty plea. Finally, the fact that a lawyer advises a client to try and settle a matter with a victim can hardly be viewed as an invitation to try and bribe the victim nor it does not absolve appellant from responsibility for his own actions.

In conclusion, we discuss appellant's claims that direct appeal counsel was ineffective for failing to raise the issues on direct appeal and that the trial court improperly allowed PCRA counsel to withdraw when counsel did not review the case sufficiently.

His entire argument as to both issues is as follows:

#4 *QUESTION:* DID THE COURT ERR IN NOT FINDING APPELLATE COUNSEL, JOSEPH P. BURT, ESQ., OF THE ERIE COUNTY PUBLIC DEFENDER'S OFFICE, TO BE INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO INCLUDE ANY AND/OR ALL THE ABOVE MERITORIOUS ISSUES IN THE APPEAL HE PRESENTED TO THE SUPERIOR COURT OF PENNSYLVANIA?

*ANSWER:* YES

If this Honorable Court finds merit in any one of the above issues, this argument can stand alone unsupported. Therefore, there is no reason to waste the Court's time with it in this brief.

#5 *QUESTION:* DID THE COURT ERR WHEN GRANTING THE PETITION FOR LEAVE TO WITHDRAW FROM ATTORNEY MICHAEL J. NEIS, ESQ., THE COURT APPOINTED COUNSEL APPOINTED TO REPRESENT THE APPELLANT IN HIS P.C.[R.A.] ACTIONS, WITHOUT ORDERING HIM TO THOROUGHLY REVIEW AND RESEARCH THE CLAIMS MADE BY THE APPELLANT, THEN SUBMIT AND/OR ARGUE THE APPELLANTS OWN BRIEF TO THE COURT?

*ANSWER:* YES

When filing my P.C.[R.A.] motion in the lower court, I submitted copies of a facsimile of this document, one of which was forwarded to attorney Neis. It was from this document that he made his claims as set forth in *Exhibit B* contained herein. So as with the above #4, if this Honorable Court finds merit in any one of these issues, this claim is substantiated without argument.

■■■ As discussed above, we have not found "merit" in any of appellant's arguments and conclude that appellant's final two issues, as framed, do not entitle him to relief. The claims do raise, by implication, an interesting question as to our standard of review. Since we have held that several issues raised by appellant are not cognizable in the PCRA context, a question is raised as to whether those issues must be analyzed under a direct appeal standard in order to determine if direct appeal counsel was ineffective for failing to raise them.

We conclude that a direct appeal standard of review does not apply. *See Commonwealth v. Eaddy, supra,* 419 Pa.Super. 98, 614 A.2d 1203 in which we held that the PCRA must be construed so as to give effect to all provisions in a consistent manner. We noted in *Eaddy* that an allegation that direct appeal counsel was ineffective in failing to raise an issue relates to waiver and overcomes the bar of waiver. We also held that the issue not raised on direct appeal then must be analyzed in the context in which it is raised, which is a PCRA petition, and under 42 Pa.C.S. § 9543(a)(2) to determine whether it is cognizable.

Thus, in this case, for example, the allegation that direct appeal counsel was ineffective for failing to raise the issue that trial counsel was ineffective for failing to negotiate a guilty plea overcomes the bar of waiver under 42 Pa.C.S. § 9543(a)(3). However, the underlying issue (that trial counsel was ineffective for failing to negotiate a guilty plea) is not then subject to direct appeal standard of review. That issue must be analyzed under the PCRA to determine if it is cognizable. Herein, it is not since it does not fall within any of the categories of issues which are cognizable under the PCRA. Otherwise, a mere allegation that direct appeal counsel was ineffective for failing to raise an issue would result in what is, in effect, a second direct appeal. It also would mean that one sentence in a brief would completely eradicate the PCRA provisions relating to the cognizability of issues.

Order affirmed.