**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Gregory HAYES, Appellant.**

Superior Court of Pennsylvania.

Argued May 5, 2000.

Filed June 13, 2000.

Reargument Denied Aug. 18, 2000.

Robert M. Buttner, Scranton, for appellant.

Christopher Caputo, Asst. Dist. Atty., Scranton, for Commonwealth, appellee.

Before CAVANAUGH, STEVENS, and OLSZEWSKI, JJ.

OLSZEWSKI, J.:

¶ 1 Gregory Hayes appeals his judgment of sentence entered by the Lackawanna County Court of Common Pleas subsequent to a waiver trial. The trial court convicted appellant of first-degree murder and sentenced him to life imprisonment. We affirm.

¶ 2 Appellant and Karen Maddox, the victim, were crack cocaine addicts who supported their habit by acting as intermediaries for local drug users.[1] These two individuals had an acrimonious relationship that included both verbal and physical confrontations. Appellant distrusted the victim and accused her of cheating him out of his share of cocaine, acting as a confidential informant, and selling drugs in an indiscreet manner. The events leading up to the homicide occurred on February 3, 1997, when appellant sold Fred Gibson a rock of crack cocaine.

¶ 3 Gibson, who suffered from numerous diseases including end-stage renal disease, had been hospitalized for most of December 1996 and January 1997. While he was in the hospital, his veterans disability check was automatically deposited into his bank account. Since he had not paid his rent for two months, this resulted in a rather large balance. Soon after his discharge from the hospital, Gibson encountered appellant at Herbies' Bar in Scranton. There, appellant solicited Gibson to purchase crack cocaine. After initially declining the offer, Gibson reconsidered and purchased a rock of crack cocaine.

¶ 4 Gibson returned to his apartment and smoked the cocaine. He soon hungered for more. Thus Gibson located appellant and, along with several other people, engaged in a sixteen-hour binge of crack cocaine ingestion funded by Gibson. After a final excursion to acquire more cocaine, appellant and co-defendant, William Cotillis, returned to Gibson's apartment house with the victim.

¶ 5 Gibson testified that he heard several people arguing on the second-floor landing to his apartment building and opened his door to listen to the commotion. He observed appellant punch the victim several times about the head and then watched as appellant and Cotillis lifted the victim up and threw her over the balcony to the ground seventeen feet below, resulting in her death.

¶ 6 In an effort to dispose of the body, appellant and Cotillis then wrapped the victim in a bed sheet obtained from Gibson's apartment and placed the victim behind the seat of Cotillis' truck. The victim and Cotillis then drove to Elmhurst Boulevard in Dunmore, where they dumped the body in a wooded area just off the roadway.

---

1. These facts are gleaned from the trial court opinion filed by the Honorable Terrence R. Nealon on March 23, 1999.

¶ 7 After conducting a waiver trial, Judge Nealon convicted appellant of first-degree murder, hindering apprehension or prosecution, intimidation of witnesses, and abuse of a corpse. Appellant then filed this timely appeal.

¶ 8 Appellant raises the following questions for our review:

A. Did Trial Counsel render ineffective assistance of counsel when, in seeking suppression of statements made by the Defendant on February 19, 1997 to Trooper Thomas Kobeski, he failed to raise the Defendant's right to counsel as provided for within the context of the Fifth Amendment of the United States Constitution?

B. Did the Trial Court err in determining that the Defendant was not in custody and was not required to be informed of his rights under Miranda as derived from the Fifth and Fourteenth Amendments of the United States Constitution when he was transported to the State Police Barracks, placed in an interview room for over four hours and statements were obtained from him by Trooper Joseph Pacifico on February 19, 1997?

C. Did Trial Counsel render ineffective assistance of counsel in stipulating to Commonwealth Exhibit # 3, in its entirety, which was comprised of medical records of Fred Gibson and contained medical opinions?

D. Did the Trial Court err or abuse its discretion in failing to consider the statements of William Cotillis as related to the Trial Court through Ashleigh Lamaster?

F[sic]. Did Trial Counsel render ineffective assistance of counsel in failing to secure the admissibility of statements of William Cotillis made to Ashleigh Lamaster under an alternative theory to the exclusionary hearsay rule?

Appellant's Brief, at 4.

¶ 9 In order to establish a successful ineffectiveness claim, appellant must demonstrate that: (1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for his action or inaction designed to effectuate appellant's interest; and (3) there is a reasonable probability that counsel's decision prejudiced appellant in such a manner that the outcome of the proceeding would have been different. *See Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261, 273–74 (2000).

¶ 10 First, appellant argues that his trial counsel provided ineffective assistance because he failed to raise appellant's Fifth Amendment right to counsel in his attempt to suppress appellant's statements to Trooper Kobeski. To support this issue, appellant highlights two instances that he believes should suffice to invoke his Fifth Amendment right to counsel. Appellant first argues that the authorities failed to advise him of his *Miranda* rights prior to initiating the 4:30 p.m. interrogation on February 19, 1997; secondly, he contends that the interrogation proceeded in violation of his previously asserted Fifth Amendment rights. Our research and our review of the record leads us to the conclusion that neither of these sub-claims has any arguable merit. Therefore, trial counsel was not ineffective for refusing to litigate a meritless claim. *See Commonwealth v. Lopez*, 559 Pa. 131, 739 A.2d 485, 495 (1999).

¶ 11 State authorities transferred appellant to the State Police Barracks around 4:30 p.m. on February 19, 1999. While at the barracks, appellant made at least two statements to the police, one after 8:30 p.m. and one after 10:30 p.m. The Commonwealth contends that Trooper Kobeski instructed appellant of his *Miranda* rights at 4:30 p.m. and twice again prior to taking the two statements. Trooper Kobeski testified that he orally Mirandized appellant on the first two occasions, and that he obtained a signed waiver before appellant made the second statement. *See Commonwealth v. Servich*, 412 Pa.Super. 120, 602 A.2d 1338, 1344 (1992) (holding that defendant's waiver of *Miranda* rights need

not be in writing). Appellant, of course, alleges that the authorities had not informed him of his *Miranda* rights prior to his signed waiver at 10:30 p.m.

¶ 12 When reviewing such a claim, "the Commonwealth must demonstrate that the accused explicitly waived his *Miranda* rights in order for ... statements made in the course of custodial interrogation to be admissible." *See Commonwealth v. Dewar*, 449 Pa.Super. 517, 674 A.2d 714, 717 (1996). Trooper Kobeski testified at the suppression hearing that he not only informed appellant of his *Miranda* rights, but also made sure that appellant understood them. He stated that he discussed each of appellant's constitutional rights in a conversational manner and appellant indicated that he understood those rights.[2] "It is within the sole province of the suppression court to weigh the credibility of witnesses." *See Commonwealth v. Valentin*, 748 A.2d 711, 713 (Pa.Super. 2000). In the instant case, the suppression court found Trooper Kobeski's testimony more credible than defendant's and therefore made a finding of fact that defendant had been advised of his rights at approximately 4:30 p.m. on February 19, 1997. *See* Suppression Court Opinion, 2/25/98, at 6. The record supports this factual finding; therefore, appellant's first sub-claim alleging that his statement was elicited in violation of his Fifth Amendment rights must fail.

¶ 13 In the second sub-claim, appellant argues that his request for counsel prior to the 4:30 p.m. interrogation should be enough to invoke his Fifth Amendment right to counsel. Trooper Pacifico arrested appellant for possessing drug paraphernalia immediately following an interview conducted between 3:40 and 5:40 a.m. on February 19, 1997. Appellant was then transported to the Lackawanna County Prison, where he remained until late the next afternoon. Sometime around 4:00 p.m. that day, appellant applied for a public defender to help him defend against the possession charge. Shortly thereafter, state authorities took appellant to the State Police barracks where Trooper Kobeski conducted the interview discussed above. Appellant now argues that his request for a public defender at 4:00 p.m. invoked his Fifth Amendment right to counsel.

¶ 14 Although both the Fifth and Sixth Amendments provide a right to counsel, each amendment affords different protections and requires different actions to initiate those protections. For instance,

> The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." In *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), we held that "once this right to counsel has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective." It is undisputed, and we accept for purposes of the present case, that at the time petitioner provided the incriminating statements at issue, his Sixth Amendment right had attached and had been invoked with respect to the *West Allis armed robbery*, for which he had been formally charged.

2. Trooper Kobeski testified:
In a conversation I said do you know your rights. I told him I have to read you your rights because you are in jail now you are in custody it's a custody issue.
And I said do you know your rights he said yeah yeah yeah. I said can you tell them can you tell me them? Yeah Yeah. I have the right to remain silent and all of that. I said do you know the rest of them. Yeah I know them. He wanted to talk I said no.

you have the right to remain silent. Anything you say or do can be and will be used against you in a court of law. You have the right to speak to an attorney prior to or during any questioning. If you can't afford one one will be appointed to you. Also I pointed out to him that he wouldn't be threatened and no promises were going to be made to him at any point in time.
N.T. Suppression Hearing, 12/19/97, at 149–52.

The Sixth Amendment right, however, is offense-specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, " 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *United States v. Gouveia*, 467 U.S. 180, 188, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion)). And just as the right is offense-specific, so also its *Michigan v. Jackson* effect of invalidating subsequent waivers in police-initiated interviews is offense-specific.

"The police have an interest ... in investigating new or additional crimes [after an individual is formally charged with one crime.] ... [T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at the time, would unnecessarily frustrate the public's interest in the investigation of criminal activities...." *Maine v. Moulton*, 474 U.S. 159, 179–180, 106 S.Ct. 477, 488–489, 88 L.Ed.2d 481 (1985).

"Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are of course, admissible at a trial of those offenses." *Id.*, at 180, n. 16, 106 S.Ct., at 489, n. 16.

See also *Moran v. Burbine*, 475 U.S. 412, 431, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986). Because petitioner provided the statements at issue here before his Sixth Amendment right to counsel with respect to the *Caledonia offenses* had been (or even could have been) invoked, that right poses no bar to the admission of the statements in this case.

Petitioner relies, however, upon a different "right to counsel," found not in the text of the Sixth Amendment, but in this Court's jurisprudence relating to the Fifth Amendment guarantee that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), we established a number of prophylactic rights designed to counteract the "inherently compelling pressures" of custodial interrogation, including the right to have counsel present. *Miranda* did not hold, however, that those rights could not be waived. On the contrary, the opinion recognized that the statements elicited during custodial interrogation would be admissible if the prosecution could establish that the suspect "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.*, at 475, 86 S.Ct., at 1628.

In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), we established a second layer of prophylaxis for the *Miranda* right to counsel: once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached "until counsel has been made available to him," 451 U.S., at 484–485, 101 S.Ct., at 1884–1885—which means, we have most recently held, that counsel must be present, *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). If the police° do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspects executes a waiver and his statements would be considered voluntary under traditional standards. This is "designed to prevent police from badgering a de-

fendant into waiving his previously asserted *Miranda* rights," *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990). The *Edwards* rule, moreover, is *not* offense-specific: once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present. *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

*Commonwealth v. Wyatt*, 447 Pa.Super. 393, 669 A.2d 954, 956–57 (1995) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 174–77, 111 S.Ct. 2204, 2207–08, 115 L.Ed.2d 158 (1991)).

 ¶ 15 Just as in *Wyatt* and *McNeil*, appellant in the instant case provided the statements at issue long before his Sixth Amendment right to counsel had attached to the criminal homicide charges. Therefore, Sixth Amendment protections pose no bar to the admission of appellant's statements to Trooper Kobeski in this case. Nonetheless, appellant argues that, by requesting an attorney prior to his interview with Trooper Kobeski, he invoked his non-offense-specific *Miranda–Edwards* right to counsel. *Edwards*, however, requires that the suspect must express

> his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*. It requires, at a minimum, some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police. Requesting the assistance of an attorney at a bail hearing does not bear that construction.

*McNeil*, 501 U.S. at 178, 111 S.Ct. 2204 (citations omitted). In the instant case, appellant requested counsel to assist him with the drug possession offense that Trooper Pacifico had charged him with

earlier that morning. The Public Defender petition contains no indication that appellant had requested assistance with the subsequent custodial interrogation regarding the homicide. Therefore, there is no merit in the argument that appellant's action of filing the petition amounted to an invocation of his Fifth Amendment right to counsel. As such, trial counsel did not provide ineffective assistance by declining to argue a meritless motion.

 ¶ 16 Next, appellant argues that the trial court erred in finding that he was not in custody for *Miranda* purposes. Appellant claims that an officer from the Scranton Police Department and a trooper from the Pennsylvania State Police located appellant walking down a street in Scranton between 1:00 and 1:30 a.m. on February 19, 1997. Upon confronting him, the authorities requested that appellant accompany them to the State Police barracks. Appellant also claims that after arriving at the barracks, he had to wait in an interview room for almost two hours before Trooper Pacifico arrived. Trooper Pacifico then interviewed appellant for two hours. Appellant states that he only received one bathroom break[3] during his four hours at the barracks and had no chance to smoke, eat, or drink. Consequently, appellant argues that he did not feel that he was free to leave, therefore the interview constituted custodial interrogation that would require Trooper Pacifico to inform him of his Fifth Amendment rights. We agree.

¶ 17 Our Supreme Court has defined custody for *Miranda* purposes as:

> [When a person] is physically denied of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. Moreover, the test for custodial interrogation does not de-

---

3. Appellant claims that during this break, a trooper followed him into the bathroom and waited until he had finished.

pend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes his freedom of action is being restricted.

*Commonwealth v. Gibson*, 553 Pa. 648, 720 A.2d 473, 480 (1998).

¶ 18 The Commonwealth, on the other hand, urges this Court to follow the rationale of *Commonwealth v. Williams*, 539 Pa. 61, 650 A.2d 420 (1994). The facts of the instant case closely pattern those discussed in *Williams*, including a suspect that "voluntarily" agrees to go to the police station, holding him there until the interviewer arrived, and engaging in questioning that extended over several hours. *See id.* at 426–27. The primary difference between this case and *Williams* is that the suspect in *Williams* was told on several occasions that he was free to leave. In the instant case, the record does not indicate that any person informed appellant that he was free to leave. After considering the totality of the circumstances surrounding appellant's detention, appellant could have "reasonably believe[d that] his freedom of action [was] being restricted." *Id.* at 427. Therefore, the trial court erred in determining that appellant was not in custody during the early morning hours of February 19, 1997.

¶ 19 Appellant, however, argues that, in order to correct the prejudicial error, he should receive a new trial. We disagree. When a trial court fills the factfinder role, it is "presumptively … capable of disregarding inadmissible evidence and considering only relevant and competent evidence." *Commonwealth v. Neal*, 713 A.2d 657, 662 (Pa.Super.1998). Here, the trial court provided the following caveat:

The factual findings identified and discussed below are derived from the testimony and evidence which have been determined to be competent, credible and relevant. The following conclusions are based, in part, upon the appearance, demeanor and character of the witnesses and other indicia of their veracity. **Testimony or evidence which is not incorporated into the factual chronology set forth below has been found to be inadmissible, irrelevant or lacking credibility.**

Trial Court Opinion, 3/26/99, at 5 (emphasis added). After reading the trial court opinion, we conclude that the evidence now in contention was not a factor in determining appellant's guilt. *See Commonwealth v. Davis*, 491 Pa. 363, 421 A.2d 179, 183 n. 6 (1980) (collecting cases holding that it is not reversible error for the trial court to hear inadmissible evidence); *see also Commonwealth v. Coon*, 695 A.2d 794, 800–01 (Pa.Super.1997) (stating that it is a judicial function to hear evidence and may properly exclude evidence from its decision although it had initially admitted the evidence). Accordingly, a new trial is not warranted on this basis.

¶ 20 Next, appellant argues that trial counsel rendered ineffective assistance of counsel by stipulating to a Commonwealth exhibit comprised of Fred Gibson's medical records. He claims that counsel developed a trial strategy to "present Gibson as an alternative suspect to that of defendant." Appellant's Brief, at 37. By stipulating to the exhibit, appellant contends that counsel undermined this theory of the case. *See id.* at 38.

¶ 21 Appellant has failed to include the stipulated medical records into the certified record. Thus we do not know exactly what the medical records contained or which portions the trial court relied upon. Therefore, we cannot determine whether the stipulated medical records contained admissible facts or inadmissible opinions and diagnoses. *See Commonwealth v. Xiong*, 428 Pa.Super. 136, 630 A.2d 446, 452 (1993). " '[F]or the purposes of appeal, it is the responsibility of the appellant to offer a complete record for our review.' " *Commonwealth v. Lassen*, 442 Pa.Super. 298, 659 A.2d 999, 1008

(1995) (quoting *Commonwealth v. Muntz*, 428 Pa.Super. 99, 630 A.2d 51, 55 (1993)). Where our review depends upon materials not present in the certified record, appellant's claim is waived. *See id.*

¶ 22 We now turn to appellant's final two arguments which we will combine into the following question: Should the statements made by William Cotillis, as related by Ashleigh Lamaster, have been introduced at trial? Appellant argues that the lower court should have admitted the statements under the "against penal interest" exception to the hearsay rule. *See* Pa.R.E. 804(b)(3). Alternatively, appellant contends that trial counsel should have sought the statements' admission by arguing that they were not used to prove the truth of the matter asserted. *See* Pa.R.E. 801(c).

¶ 23 This issue first arose when the Commonwealth brought a motion *in limine* to secure the admission of these statements. Trial counsel vigorously opposed that motion during oral argument. *See* Motions Hearing, 2/17/99, at 38–54. After listening to both positions, the trial judge ruled in favor of appellant and denied the Commonwealth's motion. Now, appellant essentially urges us to hold that he deserves a new trial because the lower court erred by ruling in his favor on the motion. This we refuse to do.

¶ 24 A panel of this Court once held that notions of equity have no place in criminal proceedings. *See Commonwealth v. Shinn*, 368 Pa.Super. 436, 534 A.2d 515, 518 (1987) (holding that "equitable estoppel has no place in the criminal law").[4] Nonetheless, a later panel has given equitable doctrines, in a criminal context, an imprimatur of validity. This Court, in *Commonwealth v. Lam*, 453 Pa.Super. 497, 684 A.2d 153 (1996), examined the concept of judicial estoppel as a viable doctrine in

criminal proceedings. *See Lam*, 684 A.2d at 164–65. Although it ultimately proved to be an unsuccessful argument, that panel accepted judicial estoppel as a practical theory. *See id.*

¶ 25 While *Shinn* may present a laudable statement regarding laches, such a broad statement has debilitating effects on both sides in a criminal trial. Both parties, after vigorously arguing their positions in an advocacy proceeding, should be able to rely upon a trial judge's rulings. Essentially, if we accept the argument that subsequent counsel can challenge prior counsel's trial strategy post hoc where hindsight reveals the initial strategy ultimately lacked convincing merit, each case would languish in indecision. *See Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167, 1189 (1999) (holding that counsel's strategy would be constitutionally effective if the tactical course chosen "had some reasonable basis designed to effectuate his client's interests"). Therefore, we hold today that a party in a criminal proceeding cannot argue for a specific ruling and then, after obtaining a favorable ruling, claim that the trial judge committed an error of law in making that ruling.

¶ 26 Judgment of sentence affirmed.

¶ 27 CAVANAUGH, J., Concurs in the Result.

---

4. The Court in *Shinn* ruled that since both laches and equitable estoppel are equitable remedies, and that an assertion of laches is not permitted in criminal proceedings, then equitable estoppel should be equally barred.

We agree with the *Shinn* Court's appraisal of laches: a criminal defendant should always be able to present credible exculpatory evidence.